**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Sheldon L. Pollock**
**Michael D. Paley**
**Paul G. Gizzi**
**Jessica Quinn**
**Laura Yeu**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, NY 10004-2616**
**212-336-0077 (Gizzi)**
**Email: gizzip@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                              **Plaintiff,**<br><br>       **-against-**<br><br>**DAVID BANISTER and THE MARKET ANALYSTS GROUP, LLC,**<br><br>                              **Defendants.** | **COMPLAINT**<br><br>**24 Civ. _____ (     )**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

Defendants David Banister ("Banister") and The Market Analysts Group, LLC ("Market

Analysts" and, together with Banister, "Defendants"), alleges as follows:

## SUMMARY

1.       Between December 2020 and March 2021 (the "Relevant Period"), Defendants

Banister and Market Analysts—Banister's wholly owned business—engaged in a fraudulent

scheme to manipulate the stock of a public company, BioVie Inc. ("BioVie"). Defendants

promoted BioVie to investors—encouraging them to buy and hold the stock—while concealing Banister's plans to sell his own BioVie shares.

2.      Defendants perpetrated this scheme through subscription-based stock advisory services that they owned and controlled, as well as postings on an investment-focused social media platform on which Defendants had more than 60,000 followers.

3.      In recommending BioVie stock to investors, Defendants touted recent increases in trading volume while failing to disclose that such spikes were driven in significant part by Banister's own purchases. Banister's trading activity created an artificial appearance of increased market demand for BioVie stock, which Defendants could then highlight to encourage investors to buy BioVie, while at the same time secretly planning to sell Banister's shares.

4.      As of a result of Defendants' scheme, Banister pocketed net profits totaling approximately $1.37 million from his sales of BioVie stock in the Relevant Period. Meanwhile, Defendants' scheme harmed other BioVie investors who paid inflated prices for their shares and/or suffered trading losses after buying the stock following Defendants' misleading recommendations.

## VIOLATIONS

5.      By virtue of the foregoing conduct and as alleged further herein: (i) Defendants Banister and Market Analysts have violated Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)]; and (ii) Banister has also violated Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)] and Section 9(a) of the Exchange Act [15

U.S.C. § 78i(a)].

6.      Unless Defendants are restrained and enjoined, they will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

7.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], Exchange Act Section 21(d) [15 U.S.C. § 78u(d)], and Advisers Act Sections 209(d) and 209(e) [15 U.S.C. §§ 80b-9(d) and 80b-9(e)].

8.      The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Defendants to disgorge all ill-gotten gains they received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Defendants to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act Section 209(e) [15 U.S.C. § 80b-9(e)]; and (d) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14].

10.     Defendants, directly and indirectly, have made use of the means or

instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

11.    Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)], Exchange Act Section 27 [15 U.S.C. § 78aa], and Advisers Act Section 214 [15 U.S.C. § 80b-14]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. For instance, multiple investors residing within this District purchased BioVie stock during the Relevant Period and, in at least one case, did so after receiving Defendants' recommendation. Additionally, BioVie stock trades on the Nasdaq exchange located within this District.

## DEFENDANTS

12.    **Banister**, age 59, is a resident of Middletown, Rhode Island. Banister is the founder and sole owner and employee of Market Analysts, where he holds the title of Chief Strategist. Through Market Analysts, Banister operates paid subscription services that provide advice to subscribers about investments. During the Relevant Period, Banister also used the handle "@StockReversals" to regularly post messages on behalf of Market Analysts on Stocktwits, an investment-focused social media platform, where he had more than 60,000 followers.

13.    From 2000 to 2009, Banister worked as a registered representative for at least four different brokerage firms and held various securities industry licenses, including Series 7 (registered representative), Series 63 (Uniform Securities Agent State Law), and Series 66 (Uniform Combined State Law). According to Banister's LinkedIn profile, he also previously formed an investment advisory business.

14.    **Market Analysts** is a Delaware limited liability company headquartered in

Middletown, Rhode Island, which Banister formed in 2009, and owned and controlled at all relevant times. Market Analysts holds itself out as "[p]roviding market beating online-subscription based Advisory Services for Active Investors and Traders." Market Analysts offers several paid subscription services, including, as relevant here, Tipping Point Stocks and Stock Reversals Premium (together with Tipping Point Stocks, the "Subscription Services"). The Subscription Services promised either "24/7" or "24/5" access to Banister, as Market Analysts' Chief Strategist. Market Analysts has never been registered with the Commission in any capacity.

## RELEVANT PUBLIC COMPANY

15.     **BioVie** is a Nevada corporation headquartered in Carson City, Nevada. BioVie's shares trade on the Nasdaq exchange under the ticker symbol BIVI. According to its filings with the Commission, during the Relevant Period BioVie purported to be a clinical-stage company developing innovative drug therapies for the treatment of neurological and neurodegenerative disorders and advanced liver disease. BioVie has a class of securities registered under Exchange Act Section 12(b) [15 U.S.C. § 78*l*(g)].[1]

## FACTS

### I.     Background

####     A.     Market Analysts' Subscription Services

16.     Defendants owned and controlled the Subscription Services and used them to carry out their fraudulent scheme.

17.     During the Relevant Period, the Subscription Services together had hundreds of

---

[1] BioVie's Chairman and CEO during the Relevant Period, Terren Peizer, was convicted in June 2024 for insider trading in 2021 involving Ontrak Inc., a different public company for which he was then also serving as Chairman and CEO. *United States v. Terren Peizer,* 23-cr-89(A)-DSF (C.D. Cal.).

paid subscribers.

18.    The Subscription Services provided paid subscribers with reports containing investment advice, email and text alerts containing recommendations to buy or sell stocks, and research on recommended positions.

19.    For example, as alleged in detail below, Defendants issued two research reports—one in December 2020 and a second in January 2021—in which they recommended that subscribers buy and hold BioVie stock.

20.    In addition to sending routine emails and text messages to subscribers, Defendants sometimes distributed messages to their subscriber lists in response to specific market events. At times, Banister also communicated with individual subscribers about prospective investments.

21.    On Market Analysts' website, Defendants held out Tipping Point Stocks as providing "long-term growth stock research reports and advisory service[s]."

22.    Tipping Point Stocks' website also stated, "Our goal is to enter [the recommended] stocks and hold them for 9-18 months prior to the public becoming fully aware of their dynamics and potential."

23.    Defendants claimed on Tipping Point Stocks' website to limit the number of subscribers, thereby lending it an additional air of exclusivity.

24.    Defendants held out Stock Reversals Premium on its website as a "Swing Trading and Market Forecasting Service." Defendants defined swing trading as "not Day Trading nor Long Term Investing, its [sic] exploiting a 1 day to as many as 4-8 weeks trend for profits."

25.    Stock Reversals Premium's website also described Banister, the "Chief Strategist," as "one of the top market forecasters in the world." The website stated that this expertise gave subscribers a "near unfair advantage for swing trading and market knowledge."

**B.    Investment Advisers**

26.    An investment adviser, under the Advisers Act, includes any person who, for compensation, engages in the business of advising others about investing in securities or the value of securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning these securities.

27.    An investment adviser owes a fiduciary duty to clients. This duty includes an affirmative duty of utmost good faith and a duty to act in the best interest of clients, as well as an obligation to provide full and fair disclosure of all material facts and to employ reasonable care to avoid misleading clients.

28.    Defendants acted as investment advisers, because they engaged in the business of advising their subscribers about investing in stocks and the value of those stocks in exchange for subscription fees and because they issued analyses and reports concerning investing in stocks and the value of stocks for such fees and as part of their regular business through the Subscription Services.

29.    Defendants also held themselves out as investment advisers. For example, Defendants issued reports in which they referred to their stock recommendations as investment advice, and Market Analysts' website marketed its provision of subscription-based "Advisory Services."

30.    The Advisers Act excludes from the definition of an investment adviser a publisher of any bona fide newspaper, news magazine, or business or financial publication of general and regular circulation (the "Publisher's Exclusion"). To qualify for the Publisher's Exclusion, the publication must be: (1) of a general and impersonal nature, in that the advice provided is not adapted to any specific portfolio or any client's particular needs; (2) "bona fide" or genuine, in that it contains disinterested commentary and analysis as opposed to promotional

material; and (3) of general and regular circulation, in that it is not timed to specific market activity or to events affecting, or having the ability to affect, the securities industry.

31.     During the Relevant Period, Defendants did not qualify for the Publisher's Exclusion.

32.     For example, Defendants alerted subscribers by text and email sporadically in response to market events and, through the different Subscription Services, provided advice that was tailored to the specific trading strategies of groups of investors and, in some cases, timed around Banister's own trading.

33.     Additionally, the websites for Market Analysts and the Subscription Services, as well as certain emails sent on their behalf, contained boilerplate disclaimers purporting that the material therein did not constitute investment advice. However, boilerplate disclaimers denying the provision of investment advice do not change the determination of whether a person is an investment adviser when, as here, the materials at issue in fact provided investment advice.

## II.     Defendants Manipulated the Market for BioVie Stock in December 2020.

34.     From December 10 to December 14, 2020, Defendants engaged in a scheme to manipulate the market for BioVie stock.

35.     Pursuant to the scheme, (1) Banister purchased a large amount of BioVie stock, creating the appearance of an active market for BioVie; (2) Banister entered orders intended to increase or support the share price; (3) Defendants issued a "research report" urging subscribers to buy and hold BioVie stock, while concealing that the recent volume increase was partly the result of Banister's own purchases and that Banister intended to sell his shares; and (4) Banister sold his BioVie shares for a profit, after the price of BioVie stock increased.

A. **Banister Purchased a Large Amount of BioVie Stock to Send a False Signal of Market Demand.**

36.     From at least the time BioVie stock began trading on the Nasdaq exchange on September 18, 2020, through December 9, 2020, the stock was thinly traded, with an average daily volume of only 38,294 shares.

37.     Between December 1 and December 9, 2020, BioVie's trading volume averaged only 14,266 shares per day.

38.     As Banister later observed in a report sent to Tipping Point Stocks subscribers on December 14, 2020, there was "little float for trading" BioVie stock, a reference to the relatively few shares that could be freely traded.

39.     Accordingly, Banister knew that BioVie stock was thinly traded at that time.

40.     Starting on December 10, and continuing over three trading days until December 14, 2020, Banister purchased a total of 89,585 BioVie shares for approximately $906,828.

41.     As of December 14, 2020, BioVie shares constituted a large majority by dollar amount of Banister's stock holdings.

42.     In the three trading days between December 10 and December 14, 2020, Banister purchased more BioVie shares than the total trading volume for BioVie stock in all six trading days preceding December 10 combined.

43.     Banister's purchases also constituted a substantial proportion of BioVie's daily trading volume between December 10 and December 14, 2020.

44.     For example, Banister's purchases accounted for approximately 26% of BioVie's trading volume on December 10, 2020, 24% of the trading volume on December 11, 2020, and 9% of the trading volume on December 14, 2020.

45.     In addition, on December 10, 2020, Banister placed limit orders to buy 15,500

shares of BioVie at prices exceeding the lowest asking price in the market.

46.    In the case of a purchase, a limit order is an order to buy a stock at any price up to a specific price per share designated by the purchaser.

47.    Thus, by placing limit orders above the lowest asking price in the market, Banister was offering to purchase BioVie stock at a higher price than what sellers were asking.

48.    For example, one of Banister's limit orders on December 10, 2020, was to buy 7,400 shares at a price of up to $9.75. At that time, the lowest or best asking price by a seller was $9.70, so Banister was willing to pay more than what the seller was charging.

49.    Similarly, the highest or best bid, before Banister's order, was only $9.57. Thus, Banister was willing to pay more than other prospective purchasers.

50.    Banister had access to the best bid and ask quotes for securities through his brokerage account when he traded BioVie.

51.    Placing a buy limit order above the lowest ask and highest bid in the market, as Banister did with respect to BioVie stock on December 10, 2020, generally sends a signal that there is greater demand for the applicable stock and that buyers are willing to purchase shares at a higher price, potentially moving the price upwards.

52.    In the case of BioVie, the closing share price increased from $8.55 on December 9, 2020, to $9.76 on December 10, 2020.

53.    Between December 10 and 14, 2020, in addition to placing limit orders, Banister placed market orders to buy BioVie stock, which are immediately executed at the best available price.

54.    For example, during the last ten minutes of trading on December 14, 2020—shortly before Defendants issued their first report encouraging investors to buy BioVie stock—

Banister submitted 21 market buy orders for an aggregate 5,250 shares of BioVie, accounting for nearly half the stock's trading volume in that period.

56. Driving up the trading volume of BioVie stock provided Defendants with an important metric to cite when recommending BioVie stock to investors.

56. As of the market close on December 14, 2020, the BioVie share price had increased to $12, up from $10.30 the prior trading day and representing the third consecutive day of price increases.

**B.    Defendants Issued a Misleading "Research" Report Recommending that Investors Buy and Hold BioVie Stock.**

57. Just hours after the market closed on December 14, 2020, Banister, on behalf of Market Analysts, emailed a "Buy Research Report" (the "First Buy Report") to Tipping Point Stocks subscribers.

58. Defendants determined the content of the First Buy Report and the accompanying email.

59. Pursuant to the First Buy Report and the accompanying email, Defendants recommended that subscribers buy BioVie stock and—by assigning it high target share prices over a 36-month period—Defendants suggested, in effect, that subscribers should continue to hold BioVie stock for an extended period.

60. Under the heading "Investing Advice," the First Buy Report stated, "We can buy this up to $13 . . . ," *i.e.*, one dollar above the $12 closing price as of December 14, 2020.

61. The First Buy Report also identified target share prices of $25-$50 in 3-12 months, $50-$100 in 24 months, and "as high as [$]200" in 36 months.

62. The First Buy Report further described BioVie stock as a "Tipping Point Stock," an expression that, according to the Tipping Point Stocks website, refers to a "company about to

be discovered by the crowd of Investors" and likely to experience a "breakout in share price and valuation." In other words, describing BioVie stock as a "Tipping Point Stock" signified that its price was purportedly about to surge.

63.     Defendants' First Buy Report specifically cited the trading "[v]olume coming in over the last few weeks" as a basis for their "[i]nvesting [a]dvice" to buy BioVie stock.

64.     As Defendants knew or recklessly disregarded, by virtue of Banister's own trading, that increase in trading volume was due in significant part to Banister's purchases. But Defendants failed to disclose in the First Buy Report that the spike in volume they highlighted was partly the result of Banister's own trading activity over the preceding several days.

65.     While recommending that investors buy and hold BioVie stock, Defendants also failed to disclose that Banister imminently planned to sell his own BioVie shares.

66.     To the contrary, the statement in the First Buy Report that "[w]e can buy this up to $13" suggested that Defendants would potentially be purchasing additional BioVie shares, which was, at minimum, misleading, because Banister planned to sell his shares imminently.

67.     The email transmitting the First Buy Report to subscribers contained a boilerplate disclaimer stating, "We may buy sell or hold or trade around any securities mentioned at any time without prior notice."

68.     This, too, was misleading because Banister had, in fact, already decided to sell his shares, as reflected in the timing of his sales the very next day after issuing the First Buy Report, as discussed below.

69.     On December 15, 2020, the day after the First Buy Report was issued, approximately 40 Tipping Point Stocks subscribers purchased BioVie stock for the first time.

70.     Between December 15 and 17, 2020, the purchases of BioVie stock by

Defendants' subscribers constituted a significant fraction of the trading volume.

71.    To date, at least some of the subscribers who purchased BioVie stock after receiving the First Buy Report have incurred realized and unrealized losses on their investments.

72.    BioVie shares closed on December 15, 2020, at a price of $13.19, up from $8.55 on December 9, 2020, before Banister's December 10-14 trading activity and Defendants' dissemination of the First Buy Report.

73.    Banister's conduct contributed to this price increase.

**C.    Banister Secretly Sold His BioVie Shares.**

74.    On December 15, 2020, Banister sold 43,485 BioVie shares, about half of his BioVie stock holdings, for a profit of about $88,000, as calculated using the first in, first out ("FIFO") method.[2]

75.    These sales contradicted Defendants' advice to investors in the First Buy Report.

76.    The increased demand for BioVie stock resulting from Defendants' First Buy Report enabled Banister to sell this large number of shares at a profit.

**III.    Defendants Repeated Their Manipulative Conduct.**

77.    From December 16, 2020 through March 8, 2021, Defendants urged their Tipping Point Stocks and Stock Reversals Premium subscribers, as well as Banister's followers on Stocktwits, to buy and hold BioVie stock, while failing to disclose that Banister was personally engaged in trading activity contrary to Defendants' advice.

78.    In fact, as set forth in more detail below, Defendants provided false assurances that they were similarly buying and holding BioVie stock when Banister was actually planning to

---

[2] As applicable here, FIFO is an accounting method pursuant to which securities are presumed to be sold following the same order in which they are bought.

do, or already doing, the opposite.

**A.    Banister Accumulated Large Amounts of BioVie Stock to Drive Up Trading Volume and "Prime" the Market for His Illicit Sales.**

79.    From December 17, 2020 to January 4, 2021, Banister purchased 49,070 shares of BioVie for approximately $735,000.

80.    Banister's trading accounted for a significant proportion of the trading volume for BioVie stock during this period, including especially for the three-day period from December 28 through December 30, 2020, when Banister's purchase of 27,836 shares represented about 22% of the total trading volume.

81.    These purchases created the appearance of a more active market for BioVie stock.

**B.    Defendants Issued Another Purported "Research" Report.**

82.    Around mid-day on January 4, 2021—minutes after Banister bought 8,450 shares of BioVie, his last purchase of the day — Defendants emailed a purportedly independent "research" report about BioVie (the "Second Buy Report") to Stock Reversal Premium subscribers.

83.    Defendants determined the content of the Second Buy Report and the accompanying email.

84.    Like the First Buy Report, the Second Buy Report recommended that investors buy and hold BioVie stock, advising that it was a "good time to work on accumulation [of BioVie shares] for long term investors only."

85.    In the email transmitting the Second Buy Report to Stock Reversals Premium subscribers, Defendants stated that the recommendation was a "LONG TERM buy and hold play" and "NOT a swing trade," thereby distinguishing it from other Stock Reversals Premium recommendations.

86.     The email also advised investors to "spend a few days if necessary accumulating [BioVie shares] between [$]15.50-18 area," but to "[o]nly buy if you can be patient for the potential big gains and hold for 12 months," and repeated, "12 month plus holding period highly advised."

87.     Similarly, the Second Buy Report itself advised investors that it was a "good time to accumulate [BioVie shares] from $15.50-$18 ranges with [a] 12 month plus holding period," but to "[o]nly buy if you can be patient for the potential big gains," and that "[y]ou must have a 12 month horizon plus."

88.     The Second Buy Report also identified target share prices of "$25-$50 or upwards" in 30-90 days and "in the $70 area possibly" by year-end.

89.     By comparison, BioVie's intra-day high price on December 31, 2020, the last day of trading before the issuance of the Second Buy Report, was $17.60.

90.     While recommending that investors buy and hold BioVie shares, the Second Buy Report failed to disclose that Banister planned to sell his own shares.

91.     The email transmitting the Second Buy Report to subscribers contained a boilerplate disclaimer that the Stock Reversals Premium team "may buy sell or hold or trade around any securities mentioned at any time without prior notice."

92.     This was misleading because Banister was already planning to sell his BioVie shares, and in fact began doing so approximately 30 minutes after Defendants issued the Second Buy Report, as discussed further below.

93.     Between January 4 and January 5, 2021, approximately 50 subscribers of Stock Reversals Premium and Tipping Point Stocks purchased BioVie for the first time. Subscriber purchases accounted for a substantial portion of the stock's trading volume.

94.    To date, at least some of these investors have incurred realized and unrealized losses on their BioVie share purchases.

**C.    Defendants Recommended BioVie Stock on Stocktwits.**

95.    On January 5 and January 6, 2021, Defendants also recommended the purchase of BioVie stock in posts on Stocktwits.

96.    During the Relevant Period, Banister posted the Stocktwits messages on behalf of Market Analysts, using the handle @StockReversals.

97.    Defendants' posts could be viewed by any Stocktwits user, including but not limited to Banister's more than 60,000 followers on the site.

98.    Defendants' posts purported that their subscribers had been accumulating BioVie for weeks in anticipation of an upcoming rally in the company's stock price.

99.    Some of Defendants' Stocktwits posts highlighted BioVie's positive "long-term goal" and "long-term plans here that people are not even looking at right now."

100.    While promoting BioVie stock on Stocktwits on January 5 and 6, 2021, Defendants failed to disclose Banister's plans to immediately sell his own shares.

101.    Defendants posted positively about BioVie several times throughout the day on January 5, 2021. In one of the posts, Banister stated: "$70 is my 12 month target."

102.    That day, BioVie's stock price climbed more than 20% from the prior day's closing price to an intra-day high on January 5, 2021 of $21.31.

103.    The issuance of the Second Buy Report and Defendants' posts on Stocktwits contributed to this inflation in BioVie's stock price.

**D.    Banister Secretly Sold BioVie Stock, Contrary to Defendants' Recommendations to Investors.**

104.    As he had done previously, Banister again capitalized on the price and volume

surge that followed his BioVie stock purchases and advice to investors by selling additional

BioVie shares between January 4 and January 6, 2021.

105.    As noted above, Defendants released the Second Buy Report at about noon on

January 4, 2021, advising investors to buy and hold BioVie stock.

106.    But contrary to that advice, starting at 12:40 p.m. and throughout the afternoon of

January 4, 2021, Banister sold 8,800 of his BioVie shares.

107.    Between January 5 and January 6, 2021, Banister sold an additional 22,200

shares, which Defendants failed to disclose while continuing to tout BioVie stock on Stocktwits,

108.    Banister netted profits of approximately $244,000 from his sales of BioVie stock

between January 4 and January 6, 2021, as calculated using the FIFO method.

**E.    Defendants Misled Investors about Banister's Trading Activity and Netted
$1 Million in Additional Profits.**

109.    As of the close of the market on January 6, 2021, Banister still owned 60,000

BioVie shares.

110.    To support the market for BioVie shares in advance of, and during the period of,

Banister's additional sales, Defendants continued to tout BioVie stock on Stocktwits through

early March 2021.

111.    In a number of posts, Defendants encouraged investors to buy and hold BioVie

shares for the long term. As an illustrative example, on January 16, 2021, Banister posted, "This

is a hold for the next few years while the market cap goes through the roof in my opinion."

Similarly, on January 17, 2021, Banister posted, "This is a buy-and-hold stock for long-term

potential massive wealth building. Traders not really going to do well here it's a thin float you

have to hold it."

112.    Defendants falsely represented in some of the posts that they were purchasing

BioVie shares when they were not.

113.   For example, on January 19, 2021, Banister posted, "grabbed another 800 shares at [$]37.55."

114.   On January 22, 2021, Banister posted, "adding [at] 33-34 [dollars per share] this morning and I started at [$]8.50."

115.   On January 28, 2021, Banister posted, "I am still buying [BioVie]."

116.   In fact, contrary to the foregoing statements, between January 5 and 28, 2021, Defendants did not buy a single share of BioVie stock.

117.   Defendants knew or recklessly disregarded that the January 19, January 22, and January 28, 2021 Stocktwits posts were false by virtue of Banister's familiarity with his own trading activity.

118.   Defendants also discouraged selling BioVie shares while concealing and, at times, expressly denying Banister's plans to do just that.

119.   In a January 13, 2021, post on Stocktwits that claimed BioVie was an "undervalued" opportunity for "long-term investors," Banister falsely assured, "I'm not selling a single share."

120.   On February 1, 2021, Banister posted on Stocktwits, "This is not a trading stock as I've said since $12, BUY AND HOLD!"

121.   On February 12, 2021, Defendants again discouraged selling BioVie stock with the following Banister post on Stocktwits: "Stay long, dont [sic] get shaken out by scared money on low volume."

122.   Defendants' posts on Stocktwits were, at minimum, misleading because they failed to disclose Banister's intent to sell his own BioVie shares contrary to his advice to

investors.

123.    Indeed, on February 12, 2021, the very same day that Defendants warned investors to "[s]tay long," Banister himself sold 1,200 BioVie shares.

124.    Banister sold another 3,400 shares of BioVie on February 16, 2021.

125.    But the following day, on February 17, 2021, Banister posted on Stocktwits that "whoever has been selling [BioVie] this week" was "full on stupidity," thereby encouraging investors to hold BioVie stock while keeping secret that he was one of the week's sellers.

126.    Through their continued posts encouraging investors to buy and/or hold BioVie stock, Defendants sought to impact the market in a way that would support the price of BioVie shares as Banister liquidated his own holdings.

127.    On February 26, 2021, as Banister continued selling his BioVie holdings, Banister encouraged investors to do the exact opposite, posting on Stocktwits, "Buy right, sit tight. When you buy right, you can sit out the downdrafts and not panic out for a loss"; and on February 27, 2021, Banister claimed "[T]his has $300 potential in 3 years."

128.    From February 12 to March 8, 2021, Banister sold his entire position in BioVie stock, reaping additional profits of approximately $1.04 million, as calculated using the FIFO method.

129.    As Banister was selling, BioVie's share price declined from $37.50 on February 12, 2021, to $24.49 on March 1, 2021, and thereafter continued declining until it closed at $16.36 on March 8, 2021.

130.    Ultimately, investors following Banister's buy and hold strategy with BioVie lost money on their investment.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (Banister)

131.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 25, 28-29, 32-130.

132.    Defendant Banister, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

133.    By reason of the foregoing, Defendant Banister, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and (3)
### (Market Analysts)

134.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 25, 28-29, 32-130.

135.    Defendant Market Analysts, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, and/or (2) knowingly, recklessly, or

negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

136.    By reason of the foregoing, Defendant Market Analysts, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Sections 17(a)(1) and (3) [15 U.S.C. §§ 77q(a)(1) and (3)].

**THIRD CLAIM FOR RELIEF**
**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**
**(Both Defendants)**

137.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 25, 28-29, 32-130.

138.    Defendants, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly have (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

139.    By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**FOURTH CLAIM FOR RELIEF**
**Violations of Advisers Act Sections 206(1) and (2)**
**(Both Defendants)**

140.    The Commission re-alleges and incorporates by reference here the allegations in

paragraphs 1 through 130.

141.    At all relevant times, Banister and Market Analysts were investment advisers under Advisers Act Section 202(11) [15 U.S.C. § 80b-2(11)].

142.    Banister and Market Analysts, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly have: (i) knowingly or recklessly employed one or more devices, schemes, or artifices to defraud any client or prospective client, and/or (ii) knowingly, recklessly, or negligently engaged in one or more transactions, practices, and courses of business which operated or would operate as a fraud or deceit upon any client or prospective client.

143.    By reason of the foregoing, Banister and Market Analysts, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Advisers Act Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### FIFTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 9(a)
### (Banister)

144.    The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 25, 28-29, 32-130.

145.    Banister, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

146.    By reason of the foregoing, Banister directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Exchange Act Section 9(a) [15 U.S.C.

§ 78i(a)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final

Judgment:

### I.

Permanently enjoining Banister and his agents, servants, employees and attorneys and all

persons in active concert or participation with any of them from violating, directly or indirectly,

Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Sections 9(a) and 10(b) [15

U.S.C. §§ 78i(a) and 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Advisers

Act Sections 206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### II.

Permanently enjoining Market Analysts and its agents, servants, employees and attorneys

and all persons in active concert or participation with any of them from violating, directly or

indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)], Exchange Act Section 10(b) [15

U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Advisers Act Sections

206(1) and 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### III.

Ordering Defendants to disgorge all ill-gotten gains they received directly or indirectly,

with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange

Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

### IV.

Ordering Defendants to pay civil monetary penalties under Securities Act Section 20(d)

[15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)], and Advisers Act

Section 209(e) [15 U.S.C. § 80b-9(e)]; and

## V.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by a jury.

Dated: New York, New York
       December 6, 2024

> /s/ Antonia M. Apps
> _____
> ANTONIA M. APPS
> REGIONAL DIRECTOR
> Sheldon L. Pollock
> Michael Paley
> Paul G. Gizzi
> Jessica Quinn
> Laura Yeu
> Attorneys for Plaintiff
> SECURITIES AND EXCHANGE COMMISSION
> New York Regional Office
> 100 Pearl Street, Suite 20-100
> New York, NY  10004-2616
> 212-336-0077 (Gizzi)
> Email: gizzip@sec.gov