**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------X
                                          )
SECURITIES AND EXCHANGE,                  )
COMMISSION,                               )
                         Plaintiff,       )
                                          )        Civil Action No. 24-9308-ER
     -against-                            )
                                          )
DAVID BANISTER and THE MARKET             )
ANALYSTS GROUP, LLC,                      )
                                          )
                                          )
                         Defendants.      )
                                          )
------------------------------------------------------X
```

<u>**DEFENDANTS DAVID BANISTER AND THE MARKET ANALYSTS GROUP, LLC'S**</u>
<u>**ANSWER TO THE COMPLAINT**</u>

Defendant David Banister ("Defendant" or "Banister") and The Market Analysts Group, LLC ("Defendant" or "Market Analysts"), (Banister and Market Analysts shall be collectively referred to herein as "Defendants"), by their undersigned attorneys, respectfully submit this Answer to the Complaint of the Securities and Exchange Commission ("Complaint") in the captioned matter.

<u>**PRELIMINARY STATEMENT OF FACTS**</u>

Before responding paragraph by paragraph to the specific allegations of the Complaint, and in order to place those specific responses in context, Defendants offer the following preliminary statement of facts.

<u>**Introduction**</u>

1.   David Banister is an experienced securities market professional who trades a wide variety of financial instruments, including publicly traded equities, on a proprietary basis.  He also

1

shares ideas about his trading strategies and, periodically, disseminates research as well as technical analysis using his proprietary behavioral pattern chart reads, market and sector forecasts using the same chart methodologies, and regular updates. These publications and forecasts include 3x ETF securities, ES Futures, and Individual publicly traded companies to paid subscribers through The Market Analysts Group LLC. Subscribers of Banister's publications are cautioned to consult their own investment and financial advisers before making any investment decisions, and that Banister and Market Analysts are not registered investment advisers and do not provide investment advice.

2.    From December 2020, through March 2021, Banister purchased and sold shares of a biotech company, BioVie Inc. ("BIVI"), after he conducted extensive due diligence regarding the company and its management. Banister first learned about the company after its initial public offering in September 2020, and was impressed with BioVie's prospects for a multitude of reasons, which he articulated in his first in-depth research report on December 14, 2020 to his specific Tipping Point Stocks service which focuses on intermediate to longer term holding periods as opposed to the other three short term swing trading services.

3.    Banister's trading strategy in BIVI, including the allotment of capital, the timing of purchases and sales, and the ultimate liquidation of his position in March 2021, was consistent with the successful swing trading strategy he had developed and employed over the last 15 years in his online publications and other online media outlets on occasion. All of the transactions he made in BIVI were bona fide, arms-length trades. At no time did he attempt to unduly influence the market by creating an artificial appearance of market activity or by creating an artificially inflated price. Nor did he try to "pump" the stock by

disseminating false or misleading information about the company.  Banister's due diligence convinced him that BioVie had the potential to be an excellent long-term investment and he shared his reasons for believing this with his readers.  Subscribers to Banister's publications knew that he was a swing trader and that he was not precluded from trading around his BIVI position or liquidating the entire position even if he continued to believe that it was a good long-term investment. The best practices guide sent to members of the TPS and or SRP service upon joining, as well as published for members to review on the websites, outlines specific swing trading and trading around core position methodologies that he uses on a regular basis.

4.    After Banister liquidated his position in BIVI, he continued to follow and write about the company including contacting Life Sci Advisors, Red Chip Review who was the IR rep for BIVI, members of BIVI management, consulting research from B. Riley Securities, Inc. ("B. Riley") and other industry contacts.  Shares of BIVI, like almost all biotech stocks, declined precipitously starting in February of 2021, as a result of the COVID pandemic and the impact it had on the biotech sector.  These declines were impossible to forecast due to the unknown industry effects of the worldwide COVID pandemic. This pandemic ended up causing massive disruption to ongoing research in the sector which also effected enrollment of cohorts in trials across the industry with unknown length of future delays. Even after liquidating his position in BIVI, Banister suffered serious losses in other company stocks he was writing about in his services along with his members, including biotech stocks and most small to mid cap sectors accumulated in March 2021 and thereafter.

**Banister's "Swing Trading"**

5.  Banister trades securities and other financial instruments on a proprietary basis and engages in "swing trading." This involves purchases and sales of securities in as little as one day or as long as four or five weeks, based upon business fundamentals and the price movement of the securities over a specific period of time.

6.  Typically, Banister looks for price targets to be achieved over a short term window of time, and after he has accumulated a position in a stock recommends to members and or often sells half or more of his position as a particular security advances in price, and closes out positions when his target price is achieved and or a stop loss point is hit.  He has engaged in this type of trading activity with various securities for more than 15 years. This swing trade methodology makes up the bulk of his proprietary work and involves complex Fibonacci sequencing patterns, Elliott Wave Theory elements, along with his own base pattern and other methodologies to project movements in advance.

**The Market Analysts Group and Banister's Publications**

7.  Operating through his company, The Market Analysts Group, LLC, Banister also publishes opinions regarding a wide variety of topics related to the financial markets.  During the relevant period described in the Complaint, these publications were disseminated in several blogs, subscription services and on The Market Analysts Group's subscription based websites: Themarketanalysts.com, srpmembers.com, the3xetftrader.com and esalerts.com as well as premium rooms on Stocktwits which were subscription based.  Most of Banister's work is based on technical analysis and his interpretation of behavioral patterns in charts over short windows of time.  Only a small amount of the services provided by Banister concern small cap or mid- cap growth stock research.  The majority of the services

provided by Banister concern swing trading in stocks, exchange traded funds ("ETFs"), and financial futures contracts based upon chart patterns, entry ranges, stop loss advisories, and target prices with daily updates every morning.  Defendants have achieved an excellent track record in providing all of these services over many years. With appropriate disclaimers, this track record is posted for swing trading of stocks and ETF's for anyone to review.

**Banister's Communications Via Stocktwits**

8.  Banister also shared his ideas regarding a multitude of issues related to the financial markets on the message boards of Stocktwits, a social media platform, which had more than three million users.   Messages are posted anonymously through usernames; Stocktwits users, including casual readers, must agree to Stocktwits' Terms of Service Agreement.  No investor or trader could reasonably rely upon messages in Stocktwits in making investment decisions.  It was common for Stocktwits to have hundreds of thousands of posts during a day covering scores of crypto, ETF, sector and individual companies.  It is impossible as a practical matter to determine how many users actually read any particular post on Stocktwits or whether any such reader actually relied upon any statements posted by other users.

9.  Neither Banister nor Market Analysts held themselves out as "investment advisers." Defendants merely expressed opinions in publications regarding a wide variety of topics, including the best practices and strategies for maximizing profits in the financial markets and daily updates on the S&P 500, Nasdaq and other sectors, with technical analysis and commentary.

10. Banister also discussed "swing trading" strategies for exchange traded funds and futures contracts and, to a lesser degree, specific equities. Banister's opinions were published regularly in Market Analysts' various subscription based websites and or through Stocktwits subscription based premium rooms which were for 3x ETF and ES futures swing trading specifically. In addition, Banister's articles on various topics have been published in Seeking Alpha, the Street.com, Kitco.com, and CBSMarketwatch.com, as well as others going back to the early 2000's.

11. Opinions and general advice provided by Market Analysts and Banister were impersonal and not tailored to the individual needs of a specific investor. Defendants customarily provided disinterested commentary and analysis, and their publications were of general and regular circulation as opposed to being issued from time to time in response to specific market activity.

12. Subscribers to Defendants' publications, and viewers of Market Analysts' website were advised in no uncertain terms that Defendants were *not* providing investment advice. Indeed, subscribers were required to and did agree to Terms of Service (both at Market Analysts' and at Stocktwits' websites) which made it perfectly clear that Defendants were not acting as their investment advisers. Readers were further cautioned to consult their own investment advisers and financial analysts before they made any financial decisions, including trades based on opinions published by Defendants. Materials were disseminated for informational purposes only. In addition to the Terms of Use Agreement, all members of Stocktwits and other Market Analysts' websites were advised to mind their risk profiles at all times and that all publications were for informational purposes only.

13. Market Analysts' websites contained the following express disclaimers:

"This material should not be considered investment advice.  The Market Analysts Group, LLC, Stockreversalspremiums.com, stockreversals.com and/or any of our affiliates are not a registered investment adviser."

"Under no circumstances should any content from this website, articles, videos, seminars or emails from Stockreversals.com or Stockerversalspremium.com or any of its affiliates be used or interpreted as a recommendation to buy or sell any type of security or commodity contract."

"This material is not a solicitation for a trading approach to financial markets.  Any investment decision must in all cases be made by the reader or by his or her registered investment advisor."

Subscribers to Defendants' publications were repeatedly reminded in emails and in the Best Practices Guides and terms of use agreements that Defendants distributed that Market Analysts and Banister did not provide investment advice and were not registered investment advisers.

14. Defendants' subscribers were not advisory clients.  Defendants did not manage the accounts of their subscribers.  Rather, Defendants merely shared their opinions regarding swing trading strategies and, to a lesser degree, individual stocks.  They received no advisory fees from their readers nor did they share in any of the profits made by readers who may have adopted Defendants' trading techniques or who may have purchased any stocks Defendants discussed.

15. Subscribers paid a flat subscription fee (monthly, quarterly or annual), which fee was not calculated in the manner that fees are typically calculated by investment advisory firms; i.e., the subscription fee was not based upon the investors' trading activity, if any, or the funds they made available for trading.

**Banister's Due Diligence, Reports and Communications regarding BioVie**

16. In or around November 2020, Banister consulted the founder of Red Chip Review ("RedChip"), David Gentry ("Gentry"), regarding a biotech stock, Cassava Sciences.

7

RedChip had been conducting business as an investor relations firm and online publisher of small cap stock content for 30 years and represented companies with market capitalizations in the $10 million to $7 billion range.  At that time, Gentry told Banister about BioVie Inc. ("BioVie" or "BIVI"), a biotech company that RedChip represented. BioVie was working on a Phase 2b trial based treatment for liver ascites and had recently gone public in late September 2020, via an initial public offering ("IPO").   For 30 years, Gentry had covered small cap stocks and disseminated information regarding these companies online to retail and institutional investors. It was customary for Gentry to send Banister stock ideas and introduce Banister to the chief executive officers of the companies that were clients of RedChip.  Banister often called these CEOs with a view to getting more information about their companies.  In the case of BioVie, Mr. Gentry gave Banister the contact information of BioVie's then CEO, Terren Peizer.  Banister knew of Peizer and had successfully invested in Peizer-controlled equities in the past.  Over the next weeks, Banister had several telephone conversations with Peizer regarding BioVie and its prospects.

17. Banister conducted additional due diligence regarding the composition of BioVie's board of directors.  He was particularly impressed with two board members, Cuon Do and Steve Gorlin. Cuon Do had very strong credentials as an executive in the biotech space, having served as executive vice president and chief strategy officer for Merck Pharmaceuticals and as a top executive at Samsung Biologics.  In late 2020, Mr. Do was being recruited by Peizer to become BioVie's new CEO and he was hired by the company in May 2021.  Mr. Do is currently the CEO of BioVie.

18. In conducting his due diligence, Banister learned that BioVie board member Steve Gorlin had made substantial open market purchases of BIVI after the stock's IPO.  Banister knew that Gorlin had been the founder and board member of multiple biotech companies that had been sold for billions of dollars and considered these purchases to be a very strong endorsement of BIVI.

19. Banister also consulted another respected firm in the biotech industry, LifeSci Advisors, regarding BioVie.  LifeSci Advisors, an investor relations firm, enjoys an excellent reputation in the life sciences sector and is frequently hired by biotech firms to help with investor relations, website design, investor deck presentations, presentations to family offices, investor events and conferences.  Banister often communicated with LifeSci Advisors regarding multiple biotech and life science companies.  Banister spoke periodically with a LifeSci Advisors representative who was assigned to BioVie and was able to learn more about the Company and its prospects.

20. Banister's research at this time also revealed that B. Riley Securities, a boutique broker-dealer with an excellent track record in the biotech sector, that covered  BioVie was bullish on the stock and had placed a $45 per share price target on the company's shares in January of 2021.  Banister consulted representatives of B. Riley Securities as he began working on his own original reports regarding BioVie.

21. Banister also learned that Seeking Alpha and other notable publications had published several favorable articles regarding BioVie, with full write ups and authors' opinions regarding the Company.

**Defendants' Research Report on BioVie**

22. On December 14, 2020, Banister, through Market Analysts, published a research report concerning BioVie: "TPS Buy Research Report-BIVI."   At the time the report was published, BIVI was trading around $12 per share, slightly higher than BIVI's IPO price of $10 in late September 2020.  Defendant's report is an in-depth discussion of BioVie, its management and the Company's work on improving the treatment for refractory ascites due to cirrhosis of the liver.  The report includes statements by  Peizer, then-CEO and founder of BioVie, the trading history of the stock post-IPO, target prices for the stock, and how BioVie could solve the problems associated with the poor standard of care that existed for ascites due to liver cirrhosis.  It is a carefully crafted report designed to present prospective investors with the benefit of Banister's extensive due diligence regarding the Company and its stock. Banister relied on color from CEO Peizer as well as SEC Filings, commentary and investor decks from Red Chip Review, and others as noted.

23. On January 4, 2021, Banister sent an email containing his BIVI research to "Stockreversalspremium" members, sharing that research again with Defendants' SRP swing trade members, most of whom were already TPS members and had already seen the original report.

**Banister's Swing Trading in BIVI**

24. Banister has actively traded in the stock market for 15 years.  He consistently executes a trading strategy which maximizes the opportunity for trading profits in a variety of financial instruments, including equities.  An integral part of this trading strategy concerns the allocation of funds to a particular trade or instruments and acquiring a position in a

security using micro-trade position size scaling to achieve a desired average price for the overall position.

25. Banister often acquires a large position by placing numerous orders during the course of the day to take advantage of market fluctuation and volatility. Smaller orders can be placed at any time during market hours including at or near the close of the market if Banister believes the chart in the stock is attractive or he simply wishes to add to his position before a market breakout or pullback.

26. In December 2020, based on the extensive due diligence he conducted, Banister began to accumulate a position in BIVI. In this regard, his trading was perfectly consistent with the strategy he described to his subscribers and that he had employed for various other securities in the past: i.e., scaling into a position at an average price. He purchased shares of BIVI at many different times on December 14, 2020, with a view to maximizing profits by acquiring a position in the stock at the lowest average price. Indeed, after he acquired shares of BIVI on December 14, 2020, he continued to hold his position in BIVI until February 2021.

27. During the relevant period, BIVI was actively followed and promoted by broker-dealers, and investor relations firms who exercised considerably more influence over the price action and activity in BIVI than Banister ever could or did. After Banister began to cover BIVI, the price of the stock rose based on the merits of the Company and the interest in the stock which had been generated by numerous market professionals. To wit, B. Riley a well known securities firm had their own $45 target on the shares in January of 2021 based solely on the Liver Ascites indication.

**Banister Liquidates His Position in BIVI**

28. In or around February 2021, Banister began to liquidate his long position in BIVI.  As Banister has specifically advised readers for years, Defendants:

> "may buy, sell or hold or trade around any securities mentioned at any time without prior notice.  We are active traders and may reduce positions on spikes, buy back positions on pullbacks and or close our positions at any time.  We do not always have a position in stocks mentioned in our communications…You are responsible for your own trading decisions.  Obey your risk profile at all times."

29. The fact that Banister liquidated his personal position in BIVI in February 2021, is not an indicator that his bullish sentiments regarding the Company had changed materially or that he no longer considered BioVie to be a very good long-term investment.  On the contrary, Banister is an active trader who frequently moves from one position to another for a myriad of reasons and he makes that fact abundantly clear to all of his subscribers.  Banister had acquired a large and profitable position in BIVI in his 401K account and determined to realize profits and diversify his portfolio by acquiring positions in other stocks.  This is entirely consistent with his trading practices over the long term.  In addition, these other stocks were companies he was also writing about in his publications and he therefore also participated in significant losses in these stocks from February 2021 until the Bear market ended in October of 2023.

## ANSWER TO THE SPECIFIC ALLEGATIONS IN THE COMPLAINT

Set forth below, in parentheses, are the paragraph numbers of the Complaint of the Plaintiff Securities and Exchange Commission ("SEC"), followed in each instance by Defendants' answer. The titles/headings appearing below, when supplied, are those of the Plaintiff; Defendants do not admit their accuracy, and they are retained here only for convenient reference.  In the following response, this Answer employs the following abbreviations:

a) "Admit" means "Based either on personal knowledge or on information presently available, Defendants admit the referenced allegation [except where this paragraph states an exception]"

b) "Deny" means "Based on personal knowledge or on information presently available, Defendants deny the referenced allegation."

c) "Deny knowledge" means Defendants deny that they possess knowledge or information sufficient either to admit or deny the referenced allegation and insofar as the allegation may be construed as referring to Defendants, they deny them.

Any allegation not specifically admitted, denied, or otherwise addressed is denied.

## **COMPLAINT**

Admit that the SEC has made allegations against the Defendants, which Defendants admit, deny, deny knowledge of or otherwise respond to as set forth below.

## **SUMMARY**

1.      Deny.

2.      Deny.

3.      Deny.

4.      Deny.

## **VIOLATIONS**

5.      Deny.

6.      Deny.

**NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

7.    Admit that the SEC has brought this action. Deny all other allegations.

8.    Admit that the SEC seeks the relief described in Paragraph 8 of the Complaint but deny that such relief is warranted in this case.

**JURSIDICTION AND VENUE**

9.    State that this paragraph sets forth a legal conclusion as to which no response is required; otherwise deny.

10.    State that this paragraph sets forth a legal conclusion as to which no response is required.

11.    State that this paragraph sets forth a legal conclusion as to which no response is required; otherwise deny or deny knowledge of, except to admit that BioVie stock trades on NASDAQ.

**DEFENDANTS**

12.    Admitted, except denies that Defendants acted as investment advisors and deny that Banister posted messages on behalf of Market Analysts on StockTwits.

13.    Admitted, except denies that Banister formed an investment advisory business.

14.    Admit,, except that Market Analysts descriptions of its business speak for themselves.

## RELEVANT PUBLIC COMPANY

15.    Admit, except deny knowledge of the allegations in footnote 1.

## FACTS

1.    **Background**

    A.    **Market Analysts' Subscription Services**

16.     Admit that defendants owned and controlled the Subscription Services but deny that they used them to carry out any fraudulent scheme.

17.    Admit.

18.    Admit that the Subscription Services provided paid Subscribers with reports, which speak for themselves; otherwise deny.

19.    Admit that Defendants issued the two referenced research reports, which speak for themselves; otherwise deny.

20.    Admit that Defendants sent emails and other messages to subscribers, and sometimes communicated with individual subscribers, but states that the contents of such communications speak for themselves; otherwise deny.

21.     Admit that Market Analysts maintains a web site, the contents of which speak for themselves; otherwise deny.

22.    Admit that Tipping Points Stock maintains a web site, the contents of which speak for themselves; otherwise deny.

23.    Admit that Tipping Points Stock maintains a web site, the contents of which speak for themselves; otherwise deny.

24.    Admit that Stock Reversals Premium maintains a web site, the contents of which speak for themselves; otherwise deny.

25.    Admit that Stock Reversals Premium maintains a web site, the contents of which speak for themselves; otherwise deny.

B.    **Investment Advisers**

26.    Paragraph 26 contains conclusions of law to which no admission or denial is required.

27.    Paragraph 27 contains conclusions of law to which no admission or denial is required.

28.    Deny.

29.    Deny, and state that the referenced reports and website speak for themselves.

30.    Paragraph 30 contains conclusions of law to which no admission or denial is required. Further answering, Defendants qualify for the Publisher's Exclusion in any event insofar as the publications at issue were: (1) of a general and impersonal nature, in that any advice provided was not adapted to any specific portfolio or any client's particular needs; (2) "bona fide" or genuine, in that it contained disinterested commentary and analysis as opposed to promotional material; and (3) of general and regular circulation, in that it was not timed to specific market activity or to events affecting, or having the ability to affect, the securities industry.

31.    Deny.

32.    Deny.

33.    Admit that the websites for Market Analysts and the Subscription Services and certain emails sent on their behalf contained clear and express disclaimers that the material did not contain investment advice.  Deny all other allegations in Paragraph 33.

**II**. **Defendants Manipulated the Market for BioVie Stock in December 2020**

34.    Deny.

35.    Deny.

**A**. **Banister Purchased a Large Amount of BioVie Stock to Send a False Signal of Market Demand**

36.    Deny knowledge.

37.    Deny knowledge.

38.    Admits that a report was sent to Tipping Point stocks subscribers on or about December 14, 2020, which speaks for itself; otherwise deny.

39.    Admits that a report was sent to Tipping Point stocks subscribers on or about December 14, 2020, which speaks for itself; otherwise deny.

40.    Admit that Banister purchased certain shares of BioVie in December 2020, otherwise deny knowledge.

41.    Deny knowledge.

42.    Deny knowledge.

43.    Deny knowledge.

44.    Deny knowledge.

45.    Admit that Banister purchased certain shares of BioVie in December 2020, otherwise deny knowledge.

46.    Admit.

47.    Deny.

48.    Deny knowledge.

49.    Deny knowledge.

50.    Deny knowledge.

51.    Deny.

52.    Deny knowledge.

53.    Admit that Banister made certain purchases of BioVie stock in December 2020; otherwise deny knowledge..

54.    Admit that Banister made certain purchases of BioVie stock in December 2020; otherwise deny knowledge.

55.    Deny.

56.    Deny knowledge.

B. **Defendants Issued a Misleading "Research" Report Recommending that Investors Buy and Hold BioVie Stock**

57.    Admit.

58.    Admit.

59.    State that the contents of the referenced research report and email speak for themselves; otherwise deny.

60.    State that the contents of the referenced research report speak for themselves; otherwise deny.

61.    State that the contents of the referenced research report speak for themselves; otherwise deny.

62.    State that the contents of the referenced research report and website speak for themselves; otherwise deny.

63.    State that the contents of the referenced research report speak for themselves; otherwise deny.

64.    Deny.

65.    Deny.

66.    Deny.

67.    Admit that the referenced email to subscribers contained the referenced disclaimer but deny that it was "boilerplate."

68.    Deny.

69.    Deny knowledge.

70.    Deny knowledge.

71.    Deny knowledge.

72.    Deny knowledge.

73.     Deny.

C. **Banister Secretly Sold His BioVie Shares**

74.     Admit that Banister sold some of his shares of BioVie on December 15, 2020.  Deny knowledge as to all other allegations in Paragraph 74 of the Complaint.

75.     Deny.

76.     Deny.

III. **Defendants Repeated Their Manipulative Conduct**

77.     Deny that they "urged" anyone to buy and hold BioVie.  Admit that Banister sold certain shares of BioVie at certain points between December 16, 2020 through March 8, 2021, but deny that such conduct violated any law or duty or was inconsistent with Banister's repeated claims that: (1) he was a swing trader; and (2) that he had no obligation to disclose to subscribers what he was personally buying or selling at any time.

78.     Deny.

A. **Banister Accumulated Large Amounts of BioVie Stock to Drive Up Trading Volume and "Prime" the Market for His Illicit Sales.**

79.     Admit that Banister purchased certain shares of BioVie in December 2020 and January 2021; otherwise deny knowledge.

80.     Deny knowledge.

81.     Deny.

B.    **Defendants Issued Another Purported "Research" Report**

82.    Admit that Defendants emailed an independent research report about BioVie to Stock Reversal Premium Subscribers on January 4, 2021 and that Banister purchased shares of BioVie on that day. Deny all other allegations in Paragraph 82 of the Complaint.

83.    Admit that Banister purchased shares of BioVie on January 4, 2021 and emailed a research report about BioVie to subscribers that day; otherwise deny.

84.    State that the contents of the referenced research report speak for themselves; otherwise deny.

85.    State that the contents of the referenced email speak for themselves; otherwise deny.

86.    State that the contents of the referenced email speak for themselves; otherwise deny.

87.    State that the contents of the referenced research report speak for themselves; otherwise deny.

88.    State that the contents of the referenced research report speak for themselves; otherwise deny.

89.    Deny knowledge.

90**.**    State that the contents of the referenced research report speak for themselves; otherwise deny.

91.    Admit that the email transmitting the referenced research report to subscribers contained the referenced disclaimer.  Deny all other allegations in Paragraph 91, including without limitation that the disclaimer was "boilerplate."

92.     Deny.

93.     Deny knowledge.

94.     Deny knowledge.

**C.    Defendants Recommended BioVie Stock on Stocktwits**

95.     Deny knowledge, and state that any Stocktwits posts dated January 5 or 6, 2021 relating to BioVie speak for themselves.

96.     Admit that during the Relevant Period, Banister posted Stocktwits messages on behalf of Market Analysts, using the handle @StockReversals.

97.     Admit.

98.     Deny knowledge, and state that any posts speak for themselves.

99.     State that any of Defendants' Stocktwits posts relating to BioVie speak for themselves otherwise deny.

100.    Deny.

101.    Deny knowledge, and state that any Stocktwits posts dated January 5, 2021 relating to BioVie speak for themselves.

102.    Deny knowledge.

103.    Deny.

**D**.    **Banister Secretly Sold BioVie Stock, Contrary to Defendants' Recommendation to Investors**

104.    Deny.

105.    Admit that they released the referenced research report on January 4, 2021 and state that its contents speak for themselves; otherwise deny.

106.    Admit that Banister sold shares of BioVie on January 4, 2021, but deny all other allegations in Paragraph 106 of the Complaint.

107.    Admit that Banister sold shares of BioVie between January 5 and 6, 2021, but deny that such conduct was improper in any way or that Banister was obligated to disclose such transactions.

108.    Deny knowledge.

**E.    Defendants Misled Investors about Banister's Trading Activity and Netted $1 million in Additional Profits.**

109.    Deny knowledge.

110.    Deny.

111.    Admit that Banister made certain posts, the contents of which speak for themselves; otherwise deny.

112.    Deny and state that the contents of any posts speak for themselves.

113.    State that the contents of any posts speak for themselves; otherwise deny knowledge.

114.    State that the contents of any posts speak for themselves; otherwise deny knowledge.

115.    State that the contents of any posts speak for themselves; otherwise deny knowledge.

116.    Deny knowledge.

117.    Deny.

118.    Deny.

119.    State that the contents of any posts speak for themselves; otherwise deny knowledge

120.    State that the contents of any posts speak for themselves; otherwise deny knowledge.

121.    State that the contents of any posts speak for themselves; otherwise deny knowledge.

122.    Deny.

123.    State that the contents of any posts speak for themselves, admits that he sold certain shares of BioVie in February 2021 and otherwise deny knowledge.

124.    Admit that Banister sold certain shares of BioVie in February  2021.

125.    State that the contents of any posts speak for themselves; otherwise deny knowledge and deny.

126.    Deny.

127.     State that the contents of any posts speak for themselves and admits that he sold certain shares of BioVie in February 2021; otherwise deny knowledge.

128.     Admit that Banister liquidated his position in BioVie in March 2021.  Deny knowledge as to all other allegations in Paragraph 128 of the Complaint.

129.    Deny knowledge.

130.    Deny knowledge.

## FIRST CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)

### (Banister)

131.    Defendants are not required to respond to the assertions in Paragraph 131 of the Complaint.

132.    Deny.

133.    Deny.

## SECOND CLAIM FOR RELIEF

### Violations of Securities Act Section 17(a)(1) and (3)

### (Market Analysts)

134.    Defendants are not required to respond to the assertions in Paragraph 134 of the Complaint.

135.    Deny.

136.    Deny.

## THIRD CLAIM FOR RELIEF

### Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

### (Both Defendants)

25

137.    Defendants are not required to respond to the assertions in Paragraph 137 of the Complaint.

138.    Deny.

139.    Deny.

## FOURTH CLAIM FOR RELIEF

### Violations of Advisers Act Section 206(1) and (2)

### (Both Defendants)

140.    Defendants are not required to respond to the assertions in Paragraph 140 of the Complaint.

141.    Deny.

142.    Deny.

143.    Deny.

## FIFTH CLAIM FOR RELIEF

### Violations of Exchange Act Section 9(a)

### (Banister)

144.    Defendants are not required to respond to the assertions in Paragraph 144 of the Complaint.

145.    Deny.

146.    Deny.

## PRAYER FOR RELIEF

Denies that Plaintiff is entitled to the relief sought against Defendants and respectfully submits that the claims against Defendants be dismissed with prejudice and that the Court grant Defendants such further relief as is just and appropriate.

## AFFIRMATIVE AND/OR ADDITIONAL DEFENSES

1. Plaintiff's claims fail to state claims upon which relief can be granted.

2. The Complaint and each claim for relief, fails to plead fraud with sufficient particularity.

3. Plaintiff's claims against Defendants are barred, in whole or in part, by the applicable statute of limitations.

4. Plaintiff's claims are barred, in whole or in part, because Defendants did not make a misstatement or omission of material fact.

5. Plaintiff's claims are barred, in whole or in part, because Defendants lacked the requisite scienter, including specific intent to deceive, willfulness, recklessness, and/or negligence, necessary to establish violations of the securities laws.

6. Plaintiff's claims are barred, in whole or in part, because Defendants acted reasonably at all times and in good faith and in conformity with applicable federal statutes, rules and regulations.

7. Plaintiff's claims are barred in whole or in part because Defendants did not act as investment advisers in connection with the alleged conduct, including without limitation because Defendants are exempt from the definition of investment adviser, including without limitation because they were publishers of bona fide newspaper, news magazine

or business or financial publication of general and regular circulation under applicable law.

8.  Plaintiff's claims are barred, in whole or in part, because Defendants' disclaimers and other disclosures conformed with applicable law and industry practice.

9.  Plaintiff's claims are barred in whole or in part because Defendants did not cause any loss or risk of loss to investors.

10. Plaintiff's claims are barred in whole or in part because Defendants relied on the advice of counsel and/or others with industry expertise.

11. Plaintiff's claims are barred, in whole or in part, by the First Amendment of the United States Constitution.

12. Plaintiff's claims are barred, in whole or in part, by the major questions doctrine and/or because Plaintiff's attempted regulation of Defendants exceeds the scope of its authority.

13. Plaintiff's claims are barred, in whole or in part, by the doctrine of unclean hands.

14. Plaintiff's claim for injunctive relief is barred because, *inter alia*, there has been no violation of applicable law, and, even if there had, there is no reasonable likelihood that any violation will be repeated.  Plaintiff's injunctive relief claim is further barred because the adverse effects of an injunction far outweigh any benefit from an injunction.

15. Plaintiff's claim for penalties is barred because, *inter alia*, any alleged violation was isolated and/or unintentional.

16. Plaintiff's claim for disgorgement is barred because, *inter alia*, Defendants never received any ill-gotten profits or direct economic gains as a result of any of the actions alleged in the Complaint.

Defendants respectfully reserve the right to amend this Answer based on discovery of additional information or affirmative defenses at a later date, up to and including the time of trial.

Dated: February 10, 2025
        New York, New York

                                            Respectfully submitted,

                                            By: /s/Thomas J. McCabe
                                            Thomas J. McCabe
                                            The McCabe Law Firm PC
                                            2389 Yorktown Street
                                            Oceanside, NY 11572
                                            (917) 597-8221
                                            tmccabe@mfalaw.com

                                            By: /s/ Ian McLoughlin
                                            Ian J. McLoughlin, Esq.
                                            Shapiro, Haber & Urmy LLP
                                            One Boston Place
                                            Boston, MA 02108
                                            (617) 439-3939
                                            imcloughlin@shulaw.com
                                            Pro Hac Vice Motion Forthcoming

                                            *Attorneys for Defendants*
                                            *David Banister and The*
                                            *Market Analysts Group, LLC*

### **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on February 10, 2025.

/s/ Thomas J. McCabe